IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Honorable Marcia S. Krieger

Civil Action No. 11-cv-01201-MSK-KLM

LEROY HARRIS, JR.; and
DENVER LINCOLN LIMOUSINE, INC.,

       Plaintiffs,

v.

CITY AND COUNTY OF DENVER, d/b/a Denver International Airport;
W. BAISDEN, in his individual and official capacity; and
JOHN DOE #1, in his individual and official capacity,

       Defendants.

---

# OPINION AND ORDER GRANTING IN PART AND DENYING IN PART MOTION TO DISMISS

---

**THIS MATTER** comes before the Court on the Defendants' Motion to Dismiss Plaintiffs' First Amended Complaint and Jury Demand **(#25)**, to which the Plaintiffs responded **(#33)**, and the Defendants replied **(#41)**. Having considered the same, the Court **FINDS** and **CONCLUDES** the following.

## I. Background

This is a civil rights action brought under 42 U.S.C. § 1983 by Leroy Harris, Jr., a limousine driver, and Denver Lincoln Limousine, Inc. ("Denver Lincoln"). They allege that Defendant Officer W. Baisden and an unnamed airport security officer unlawfully detained Mr. Harris at the Denver International Airport ("DIA") and prevented him from transporting a passenger. The Defendants move for dismissal of all claims pursuant to Fed.R.Civ.P 12(b)(6).

## II. Material Facts

Construing the Plaintiffs' allegations most favorably to them, the Court finds that the First Amended Complaint **(#19)** ("Complaint") alleges the following facts.

Denver Lincoln is a limousine service company based in Aurora, Colorado. Mr. Harris, who is African-American, was employed as a driver for Denver Lincoln during the relevant time period.

On the date of the precipitating incident, November 10, 2009, a global reservation company chartered Denver Lincoln to pick up a passenger from DIA. Mr. Harris was the driver for this trip. Mr. Harris held a valid Colorado State driver's license and a DIA Ground Transportation badge, and the vehicle he drove displayed current Colorado license plates and a United States Department of Transportation ("US DOT") number.

Mr. Harris checked in with the Airport Ground Transportation at DIA and was dispatched to the Taxi/Limo Agent. He parked his limousine at the curb of Level 5 in front of door number 507; his passenger was then loaded in the vehicle. However, before the limousine departed, an unidentified DIA Ground Transportation employee[1] approached the vehicle and demanded that Mr. Harris produce a "HERDIC license." A HERDIC license is required for operators of vehicles for hire by the City and County of Denver. Denver Revised Municipal Code § 55-41 ("It shall be unlawful for any person to drive or be permitted to drive a vehicle for hire on the streets of the city for business purposes unless such person is properly licensed by the director of excise and licenses.") (the "Ordinance"). Mr. Harris responded that he did not possess this

---

[1] This individual is named as Defendant John Doe. Apparently, he has not been identified by the Plaintiffs, and therefore has not been served with process. More than 120 days has passed since the Complaint was filed. Although the attorneys for Denver and Officer Baisden purport to represent John Doe, they cannot do so until he is identified. Therefore, this Order will not address claims brought against John Doe. The Plaintiffs shall have 45 days from the issuance of this Order to identify and serve John Doe, failing which all claims against him will be dismissed in accordance with Fed. R. Civ. P. 4 (m).

license.

The unidentified DIA employee then called Defendant Baisden, a uniformed Denver Police Department officer, to the scene. Both Officer Baisden and the unidentified DIA employee are Caucasian. The unidentified DIA employee and Officer Baisden "harassed" Mr. Harris for not having a HERDIC license. Within hearing of Mr. Harris' passenger, Officer Baisden falsely stated that Mr. Harris would not be able to get such license because he was a convicted felon. Mr. Harris attempted to show his charter order and to explain that he did not need a city license because the trip began and ended in Aurora, not Denver, Officer Baisden stated he "did not care" and refused to look at Mr. Harris' credentials.

Officer Baisden informed Mr. Harris' client that the vehicle had not been inspected by the Colorado Public Utilities Commission ("PUC) and was not properly licensed, and therefore the vehicle would be impounded. He directed the passenger to exit the vehicle, which she did. Presumably, she found alternative transportation. Officer Baisden then issued a citation to Mr. Harris alleging that he had violated Denver Revised Municipal Code § 55-41 and § 22-27 by not having a "P.U.C. Sticker on Vehicle as Required".[2]

While the Defendants were waiting for a tow truck to arrive, the president of Denver Lincoln arrived and discussed the issues with the Defendants. He was able to prevent the impoundment of the limousine. The president of Denver Lincoln is Caucasian, and he was not asked to show any driver's license, including any city driver's license.

---

[2] The Court notes that Denver Revised Municipal Code § 22-27 does not contain any requirement for display of a PUC sticker. However, Colorado state regulations require the display of a PUC sticker. 4 Code of Colo. Reg. 723-6 § 6009(g) ("A transportation carrier shall not operate a motor vehicle unless it has affixed a valid [PUC] vehicle identification stamp to the inside lower right-hand corner of the motor vehicle's windshield.").

The charges in the citation issued to Mr. Harris were dismissed by the City Attorney. Although the Plaintiffs allege that there is no requirement that Mr. Harris have a HERDIC license in order to operate at DIA, he nevertheless applied for it. His application was denied due to his criminal and driving records. Mr. Harris believes that such reasons are pretextual and that the denial of his license application was in retaliation for his challenge during the November 2009 incident.

Mr. Harris' employment with Denver Lincoln ended due his inability to obtain a HERDIC license. The company that contracted for the car with Denver Lincoln at the time of the November 2009 incident terminated its business relationship with Denver Lincoln because of the enforcement actions against Denver Lincoln drivers.

The Complaint identifies the following claims: (1) violation of Mr. Harris' Fourth Amendment right to be free from unreasonable seizure and his Fourteenth Amendment right to be free from discriminatory enforcement of the license requirement (asserted against all Defendants); (2) deprivation of each Plaintiff's due process rights based on liberty interests in employment and business relationships and reputations (asserted by both Plaintiffs against all Defendants); (3) violation of the Commerce Clause (asserted by both Plaintiffs against all Defendants); and (4) violation of the Supremacy Clause and/or Colorado state law (asserted by both Plaintiffs against all Defendants). The Plaintiffs seek an award of damages and injunctive relief in the form of an order invalidating any requirement that a driver of a limousine to DIA have a HERDIC license.

As to all claims, the Defendants contend that the Plaintiffs' allegations are insufficient to state a claim under Fed. R. Civ. P. 12(b)(6). As to those stated against the City and County of Denver ("Denver") based on the actions of the individual defendants, Denver seeks dismissal for

failure to allege that the individual Defendants were acting pursuant to a governmental policy or custom. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694, (1978) (a local government may be held liable for its employee's constitutional violation only when the employee is "execut[ing the] government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may be fairly said to represent official policy"). In addition, as to claims asserting individual liability, Officer Baisden offers the defense of qualified immunity.

### III. Standard of Review

**A.     Rule 12(b)(6)**

Although different grounds are specified as to particular claims, the Defendants generally move for dismissal for failure to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6)  In applying Rule 12(b)(6), the Court accepts all well-pleaded facts in the Complaint as true and construes all reasonable allegations in the light most favorable to a plaintiff. *Smith v. United States*, 561 F.3d 1090, 1098 (10th Cir. 2009).

There is a strong presumption against dismissal of claims under Rule 12(b)(6). *See Cottrell, Ltd. v. Biotrol Int'l, Inc.,* 191 F.3d 1248, 1251 (10th Cir. 1999). However, a claim must be dismissed if the Complaint does not contain enough facts to make the claim "plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is plausible on its face if the Complaint contains sufficient facts for a court to draw an inference that the defendant is liable for the alleged misconduct. *See Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949 (2009) (citing *id.* at 556). Although a plaintiff is not required to include detailed factual allegations in a complaint, a complaint must contain "more than labels and conclusions" or "a formulaic recitation of the elements of a cause of action" and must "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555.

B.  *Qualified Immunity*

The doctrine of qualified immunity protects government officials who perform discretionary government functions from personal liability for civil damages and the obligation to defend the action. *See Johnson v. Fankell*, 520 U.S. 911, 914 (1997); *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). When a defendant raises a qualified immunity defense, the burden shifts to a plaintiff to satisfy a two-part test. *See Saucier v. Katz*, 533 U.S. 194, 201 (2001); *Green v. Post*, 574 F.3d 1294, 1300 (10th Cir. 2009). A plaintiff must show that he or she had a constitutional right that was infringed (the "violation prong"), and that such right was clearly established at the time of the alleged infringement (the "clearly established prong"). Although a plaintiff must ultimately establish both elements to avoid application of the doctrine, the Court has discretion to consider the prongs in the test in any order. *See Pearson v. Callahan*, 129 S.Ct. 808, 818 (2009); *Green*, 574 F.3d at 1299.

With respect to the violation prong, a plaintiff must show that the defendant's actions deprived him or her of a constitutional or statutory right. *See Albright v. Rodriguez*, 51 F.3d 1531, 1534 (10th Cir. 1995). Identification of a constitutional right in the abstract is insufficient; instead, a plaintiff must precisely articulate the clearly established right that was allegedly violated and specifically identify the defendant's conduct that violated the right. *See Green*, 574 F.3d at 1300.

For the clearly established prong, the question is whether the identified right was clearly established based on the specific facts of the case. *Brosseau v. Haugen*, 543 U.S. 194, 199–200 (2004). Typically, the inquiry is whether, on the operative date, there was binding authority from the Supreme Court or Tenth Circuit (or the clear weight of authority from other circuits) recognizing that particular conduct would constitute a violation of federal law. *York v. City of*

*Las Cruces*, 523 F.3d 1205, 1211–12 (10th Cir. 2008). The inquiry is not whether there was previous case with identical facts, but instead, whether prior caselaw put the defendants on notice that the alleged conduct would be unconstitutional. *See Gomes v. Wood*, 451 F.3d 1122, 1134 (10th Cir. 2006). This is essentially a legal question and is measured by an objective standard. *See Crawford-El v. Britton,* 523 U.S. 574, 589-90 (1998).

The defense of qualified immunity can be asserted at different junctures in a case. When it is raised in the context of a Rule 12(b)(6) motion, the Court considers only the allegations in the Complaint.

### IV. Analysis

**A.     Claim One: Violation of Mr. Harris' Fourth and Fourteenth Amendment Rights**

Claim One is brought by Mr. Harris based on his detention at the airport and the citation issued to him. The Complaint alleges that Mr. Harris' detention was unreasonable and therefore violated his rights under the Fourth Amendment to the U.S. Constitution. The Complaint also implicitly alleges that the detention violated Mr. Harris' right to equal protection under the Fourteenth Amendment to the United States Constitution because he was selected for detention (and arbitrary enforcement of the City's requirement for a HERDIC license) because he was an African-American.

The parties agree that the detention of Mr. Harris is most analogous to an investigative detention or a routine traffic stop. To show an unconstitutional violation in this context, the Complaint must allege facts, which if true, would show that there was no "reasonable suspicion" justifying the stop.[3]

---

[3] Most often this question comes up in a criminal context, in which a court makes a dual inquiry; (1) "whether the officer's action was justified at its inception," and (2) "whether it was reasonably related in scope to the circumstances which justified the interference in the first

Even if the detention was objectively reasonable for Fourth Amendment purposes, it may be unconstitutional if it is the result of selective law enforcement based on race. *See Whren v. United States*, 517 U.S. 806, 813 (1996) (although the constitutionality of a seizure under the Fourth Amendment does not depend on the motivations of the officers involved, "selective enforcement of the law based on considerations such as race" violates the Equal Protection Clause of the Fourteenth Amendment). To state a selective enforcement claim the Complaint must contain allegations that demonstrate: (1) that the defendant's action had a discriminatory effect; and (2) was motivated by a discriminatory purpose *See United States v. Alcaraz-Arellano*, 441 F.3d 1252, 1264 (10th Cir. 2006). To show a discriminatory effect, a complaint "must ... make a credible showing that a similarly-situated individual of another race could have been, but was not, [stopped or] arrested ... for the offense for which the defendant was [stopped or] arrested...." *Id*. (citation omitted). To show a discriminatory purpose, a complaint must contain allegations showing that discriminatory intent was a 'motivating factor in the decision' to enforce the criminal law against the defendant." *Id*. (citation omitted).

1. **Officer Baisden**

With respect to the Fourth Amendment, the Complaint alleges that Mr. Harris held a DIA/Ground Transportation badge issued by DIA that authorized him to operate a commercial vehicle at DIA and that no HERDIC license was required..[4]

---

place." *Terry*, 392 U.S. at 20. Whether an officer has reasonable suspicion that illegal activity has occurred or is occurring is determined based on the totality of the circumstances, taking into account of common sense and ordinary human experience. *United States v. Mendez,* 118 F.3d 1426, 1430 (10th Cir. 1997). *United States v. Williams*, 271 F.3d 1262, 1266 (10th Cir. 2001).

[4]For the purposes of this motion, the Court makes no determination as to whether a HERDIC license was required. In addition, the Court notes the distinction between the contention that DIA is not subject to Denver city ordinances and the proposition that an Ordinance requiring a HERDIC license should be invalidated because its application at DIA

The Defendants do not appear to dispute that Mr. Harris was seized for Fourth Amendment purposes at some point, either by the DIA employee and/or when Officer Baisden arrived on the scene. Instead, they contend that the detention was reasonable, but that issue is beyond the scope of the pending motion because it requires consideration of facts outside the allegations of the Complaint.

The facts alleged in the Complaint are sufficient to allege that there was an unreasonable investigative detention. Assuming the truth of the allegations and construing them in the light most favorable to Mr. Harris, he was authorized to drive a limousine to DIA in order to pick up a passenger by DIA, no HERDIC license was required and neither officer had a reasonable suspicion that Mr. Harris was engaged in illegal activity. Under these facts, the detention was not justified, and consequently Mr. Harris has adequately stated a Fourth Amendment claim against Officer Baisden.

These allegations are also sufficient to bar application of the defense of qualified immunity at this juncture. They allege a constitutional violation, and the law was clearly established that an officer may not detain a driver without reasonable suspicion of illegal activity.

As to the claim for violation of equal protection by selective enforcement, the Complaint alleges that the two officers are Caucasian, Mr. Harris is African-American, and "upon information and belief, DIA has issued hundreds of permits and thousands of Ground Transportation badges without requiring a city driver's license" Complaint ¶ 30. Mr. Harris also alleges that when the President of Denver Limousine, who is Caucasian, arrived to discuss the

---

violates the U.S. Constitution or state law. These issues are also outside the purview of the instant motion.

matter with the officers, he was not asked to show a city driver's license or any other license or badge.

These allegations are not sufficient to state a violation of equal protection claim because there is no factual allegation demonstrating that a similarly-situated individual of another race was not stopped and ticketed, or that race was the motivating factor in Mr. Harris' detention. Therefore, to the extent that Claim One is based on the Equal Protection clause of the Fourteenth Amendment, it is DISMISSED.

### 2. Denver

As noted earlier, to assert a sufficient claim against Denver based upon the actions of its employees, the Complaint must contain allegations that identify a policy or custom that was promulgated and followed by the employee. The Complaint does not identify any policy or custom that resulted in detention of Mr. Harris without reasonable suspicion or as a result of his race. Allegations that enforcement of an Ordinance requiring HERDIC license is unconstitutional is insufficient to demonstrate a policy or custom sufficient to create liability for a particular detention. As to Denver, Claim One is DISMISSED.

## B. Claim Two: Denial of Due Process

Claim Two alleges that Plaintiffs' liberty interests in their right to earn a living, do business and to be free from loss of reputation were deprived without due process. These claims are asserted against all Defendants.

To sufficiently allege a due process violation, the Complaint must state facts that demonstrate (1) the existence of a protected liberty or property interest; and (2) denial of an appropriate level of process. *See Camuglia v. City of Albuquerque*, 448 F.3d 1214, 1219 (10th Cir. 2006). Although asserted as a single claim for relief, it appears that the Plaintiffs contend

that several distinct liberty/property interests were denied: (1) Mr. Harris - loss of reputation, loss of employment, denial of a city driver's license; and (2) Denver Limousine - loss of reputation and loss of an established business relationship.

### 1. Deprivation of Plaintiffs' Interest in Reputation

Although an individual has a protected liberty interest in his or her reputation, "defamation, standing alone, [is] not sufficient to establish a claim for deprivation of a liberty interest." *Renaud v. Wyoming Dep't of Family Servs.*, 203 F.3d 723, 726-27 (10th Cir. 2000). Rather, a plaintiff must show that "the damage to his reputation is combined with an injury to a right or status established by state law." *Doe v. Bagan*, 41 F.3d 571, 575 (10th Cir. 1994).[5] To state a claim of denial of due process based on the government's impugning of a plaintiff's "good name, reputation, honor, or integrity," a plaintiff must show facts sufficient to establish the following: (1) the government made a statement about him or her that is sufficiently derogatory to injure his or her reputation, that is false, and (2) the plaintiff has experienced some governmentally imposed burden that "significantly altered [his or] her status as a matter of state law." *Gwinn v. Awmiller*, 354 F.3d 1211, 1216 (10th Cir. 2004) (citations omitted).

**(a) Officer Baisden**

According to the Complaint, Officer Baisden allegedly made two false statements: (1) that Mr. Harris was a "felon" and would not be able to get a city driver's license; and (2) the

---

[5]These issues often apply when the termination of a public employee's employment is accompanied by statements that could harm the employee's ability to obtain future employment. *Lentsch*, 741 F.2d at 303-304. The Tenth Circuit has established a four-part test for analyzing whether defamatory statements made in connection with an employment action infringe upon "a liberty interest in [one's] good name and reputation as it affects [one's] property interest in continued employment." *Workman v. Jordan*, 32 F.3d 475 (10th Cir. 1994). To be actionable, allegedly defamatory statements must (1) impugn the good name, reputation, honor, or integrity of the employee; (2) be false; (3) occur in the course of terminating the employee or must foreclose other employment opportunities; and (4) be published. *Id*. at 481.

limousine had not been inspected by the PUC.

The first statement applies to Mr. Harris, only. Assuming its falsity, the Complaint states no facts that Mr. Harris suffered any harm as a result of this statement. Although it may have been embarrassing, there are no facts showing that this statement affected Mr. Harris' legal status or employment.

The second statement, that the vehicle was not inspected by the PUC, may be false, but there is no allegation that demonstrates that it was stigmatizing as to either Plaintiff. As to Mr. Harris, the charge based on that statement was dismissed. As to Denver Limousine, its loss of business is not attributable to PUC inspection. Therefore, the Complaint fails to state sufficient allegations for a claim of deprivation of a liberty interest in reputation by either Plaintiff against Officer Baisden.

### (b) Denver

The Complaint contains no allegations showing that Denver made any false stigmatizing statement about either Plaintiff.

Accordingly, Claim 2 against Officer Baisden and Denver is DISMISSED to the extent it alleges a deprivation of an interest in reputation.

### 2. Deprivation of Mr. Harris' Interest in Employment

An individual has a protected right to enjoy employment opportunities in his chosen field. *Stidham v. Peace Officer Standards And Training*, 265 F.3d 1144 (10th Cir. 2001) (citations omitted); *Lentsch v. Marshall*, 741 F.2d 301, 303 (10th Cir.1984) ("The liberty interest that due process protects includes the individual's freedom to earn a living."). However, the interest protected by due process is the ability to pursue an occupation or calling, not the right to have a particular job. *Wroblewski v. City of Washburn*, 965 F.2d 452, 455 (7th Cir. 1992)

(citing *Board of Regents v. Roth*, 408 U.S. 564, 575 (1972)). Mr. Harris alleges generally that the Defendants deprived him of his interest in earning a living because Denver Limousine ended his employment for failure to obtain a city driver's license.

As to Officer Baisden, the Complaint only describes his conduct during the November 2009 incident. It does not contain any allegations that Officer Baisden caused Mr. Harris to lose his job with Denver Limousine. Indeed, the Complaint alleges that it was Mr. Harris' inability to obtain a HERDIC license that resulted in his loss of employment. Thus, the Complaint's allegations are insufficient to state this claim against Officer Baisden.

As to Denver, the Complaint alleges that denial of Mr. Harris' HERDIC license application resulted in his loss of employment with Denver Limousine. Recalling that Mr. Harris has only a general liberty interest in the ability to earn a living, rather than a right to a specific job with Denver Limousine[6], to state a sufficient claim, the Complaint must contain allegations that, if true, would demonstrate that he is prevented from obtaining any work in his chosen field.[7] The Amend Complaint lacks such allegations.[8]

---

[6]In order to show a protected interest in a specific job, Mr. Harris must allege facts to show that his continued employment was protected by state law or some other type of state action. *Bagan*, 41 F.3d at 576 (an interest in employment obtains constitutional status within the meaning of the Due Process Clause "by virtue of the fact that [it has] been initially recognized and protected by state law.") (citation omitted); *see also Downey v. Coalition Against Rape and Abuse, Inc.*, 143 F.Supp.2d 423, 442 (D.N.J. 2001) (where the plaintiff alleges illegal governmental interference with private employment, the Court must determine whether the plaintiff had a reasonable expectation of continued employment based upon state law, rules or regulations concerning discharge, or express or implied promises).

[7]Although the revocation or removal of a license or certificate that is "essential in the pursuit of a livelihood" requires procedural due process under the Fourteenth Amendment, *Stidham*, 265 F.3d at 1150, there is no allegation that Mr. Harris lost his license.

[8]As noted by the Defendants, Mr. Harris has no liberty or property interest in obtaining a city driver's license where no particular outcome is guaranteed by the application process. *Ky. Dep't of Corr. v. Thompson*, 490 U.S. 454, 463 (1989) (in order to create liberty interest, state regulations must contain explicitly mandatory language, "*i.e.*, specific directives to the

### 3. Deprivation of Denver Limousine's Interest in Existing Business Relationships

Denver Limousine alleges that the client company that had contracted for its services during the November 2009 incident subsequently terminated its relationship with Denver Limousine "after the national company learned that DPD was citing [Denver Lincoln's] drivers and vehicles for allegedly not being properly licensed pursuant to the city driver's license requirement." Complaint ¶ 50.

Government action that causes a plaintiff to lose an established business relationship, without adequate process, can support a due process claim. *Ward v. Anderson*, 494 F.3d 929, 934 n. 6 (10th Cir. 2007) (alleged injury to existing business relationships is generally sufficient to support a claim under procedural due process). However, government action that simply makes a company less attractive to clients does not implicate a liberty interest. *Phelps v. Wichita Eagle-Beacon*, 886 F.2d 1262, 1269 (10th Cir. 1989).

**(b) Officer Baisden**

According to the Complaint, in the course of wrongfully enforcing Denver's Ordinance requiring a HERDIC license, Officer Baisden ordered Denver Limousine's passenger to exit the vehicle and forced her to obtain alternate transportation. Denver Limousine alleges that after learning of this, ended its relationship with Denver Limousine.

These allegations are insufficient to state a denial of due process claim against Officer Baisden. It may be that the customer reported the incident to the entity that made her reservation (Empire/CLS), and that her complaint was considered by Empire/CLS. But the Complaint does

---

decisionmaker that if the regulations' substantive predicates are present, a particular outcome must follow). There is no allegation that the licensing ordinance contains mandatory language that requires the issuance of a license to Mr. Harris. Therefore, Mr. Harris cannot assert a claim for deprivation of due process based on this alleged interest against any of the Defendants.

not contain those allegations, nor allegations that it was Officer Baisden's conduct that caused Empire/CLS to terminate its business with Denver Limousine. The Complaint states that Empire/CLS chose to terminate its business relationship with Denver Limousine at a particular point in time - after it learned that "DPD was citing [Denver Lincoln's] drivers and vehicles for allegedly not being properly licensed pursuant to the city driver's license requirement." It does not state that the November 2009 incident caused Empire/CLS to make the decision not to do business with Denver Limousine. A causal relationship between the November 2009 incident and the termination of business cannot be inferred based on temporal proximity because no specific time period has been alleged. In addition, the wording of the allegation implies that there was more than one incident that influenced Empire/CLS' decision - reference to "citing drivers and vehicles." As a consequence, the allegation does not plausibly give rise to a claim against Officer Baisden for deprivation of Denver Limousine's interest in an established business relationship without due process.

**(b) Denver**

As with Claim 1, to state a claim against Denver, the Complaint must allege that there was a municipal policy or custom of permitting officers to make stops and citations based on laws that are unenforceable outside of the jurisdiction of Denver. No such facts have been alleged, and thus this claim must be DISMISSED.[9]

**C. Claim Three: Violation of Commerce Clause**

The Complaint states that the rights of both Plaintiffs under the Commerce Clause of the United States Constitution were violated by enforcement of Denver's requirement for a HERDIC

---

[9]To the extent Denver Limousine contends that it lost business because Denver's conduct in enforcing the requirement for a HERDIC license was unconstitutional or that the Ordinance creating the requirement is unconstitutional, such injury is more properly analyzed in conjunction with Claims Three (violation of Commerce Clause) and Four (preemption).

license to operate at DIA.[10]

The Commerce Clause provides that Congress has power "[t]o regulate Commerce with foreign Nations, and among the several States, and with the Indian tribes." U.S. Const. art. I, § 8, cl. 3. "It is both an enumerated grant of power to Congress and an implicit restriction on state interference with interstate commerce." *Tarrant Regional Water Dist. v. Herrmann*, 656 F.3d 1222, 1233 (10th Cir. 2011). As currently interpreted, the Commerce Clause also includes an implicit provision, known as the "dormant" Commerce Clause, that prohibits states from passing laws that discriminate against interstate commerce unless the state can show a strong public purpose. *Id.* (citations omitted). In addition, nondiscriminatory state laws can be invalidated if they impose an undue burden on interstate commerce that is "clearly excessive in relation to the putative state benefits." *Id.* (quoting *Pike v. Bruce Church, Inc.*, 397 U.S. 137 (1970)).[11] internal quotation marks omitted). To determine whether a law violates the Commerce Clause in this regard, a court must analyze: (1) whether the challenged law "affirmatively or clearly discriminates against interstate commerce on its face or in practical effect;" and (2) if not, whether any incidental effects on interstate commerce are clearly excessive in relation to the local benefits obtained under the law." *Kleinsmith v. Shurtleff*, 571 F.3d 1033, 1040 (10th Cir. 2009) (noting that discriminatory laws are those that mandate differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter).

---

[10] Although not argued by the Defendants, there is question of Mr. Harris' or Denver Limousine's standing to assert this claim. Neither has an apparent interest protected by the Commerce Clause or injured by its violation.

[11] The focus of this jurisprudence is "concern about economic protectionism-that is, regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors. The point is to effectuate the Framers' purpose to prevent a State from retreating into economic ... isolation." *Dep't of Revenue of Ky. v. Davis*, 553 U.S. 328, 337-338 (2008) (citations and internal quotation marks omitted).

To state a claim for violation of the Commerce Clause, the Complaint must contain allegations which, if true, demonstrate that the subject law is discriminatory or that it excessively burdens interstate commerce. *Kleinsmith*, 571 F.3d at 1040. "Burden" in this context is a term of art, requiring a showing of interference with the ability of out-of-state economic interests to compete with in-state interests.. *Id.* at 1041 (not every benefit or burden created by local law is relevant under dormant Commerce Clause, only one that "alters the competitive balance between in-state and out-of-state firms") (citation omitted).

Understanding this, the Court notes that a violation commerce clause claim is directed at a particular law and the entity that enacted it - in this case, Denver. As Officer Baisden did not adopt or enact the Ordinance, there can be no claim of this nature asserted against him in his individual capacity.. As to him, the claim must be DISMISSED

Assuming that Claim 2 is focused on the Denver Ordinance that requires a HERDIC license or the enforcement of such Ordinance at DIA, the allegations in the Complaint are also insufficient.[12] Other than the conclusory statement that the licensing requirement imposes a

---

[12] In their briefing, Plaintiffs cite *Railroad Transfer Service v. City of Chicago*, 386 U.S. 351 (1967) as an analogous case supporting their claim that a local ordinance governing transport between interstate transportation hubs violates the dormant Commerce Clause. However, *Railroad Transfer Service* is not analogous, factually or legally.

Railroad Transfer Service, Inc., was under contract with the railroads to transport interstate railroad passengers between the rail terminals in Chicago. The company substituted another carrier to perform the service. Chicago, in an effort to block the replacement carrier, amended its ordinances to require all drivers to obtain a license from the city. The ordinance was thereafter amended to require that an applicant pay a fee and that any company operating such a service had to hire only Chicago residents as its drivers, maintain its principal place of business in Chicago, and file a detailed written application. The ordinance was struck down on the grounds that it violated the Interstate Commerce Act, which regulates all railroads. The Act gave the railroads, rather than the city, exclusive discretion to determine what company it would use to transport passengers between rail hubs. Although the city retained discretion to impose general safety regulations such as traffic signals and speed limits, the license requirements were not related to these issues. Because the regulations effectively vetoed the railroads' choice of carrier, they were invalid.

This action does not concern the Interstate Commerce Act, and there is no reference to an

"burden" on interstate commerce the Complaint contains no allegations showing facial discrimination against out-of-state interests or any differential effect of the licensing requirement on out-of-state actors to the benefit of in-state actors. The conclusory allegation that the law burdens commerce is insufficient to state a claim under *Twombly* and *Iqbal*. Therefore, this claim is DISMISSED.

D.      **Claim Four: Preemption and Injunctive/Declaratory Relief**

The Defendants move to dismiss Claim Four, under which the Plaintiffs seek a permanent injunction and declaration that the Denver Ordinance requiring a HERDIC license is invalid because it is preempted by state or federal law. The Defendants' argument focuses only upon Plaintiffs' entitlement to a preliminary injunction, which has not been requested, and a permanent injunction, which is a remedy, not a claim. Because preemption in this context is primarily a legal question, not an issue relating to the adequacy of the factual allegations, and no argument has been presented, the Court declines to review the sufficiency of the allegations or the merits of the claim.

Nonetheless, the Court notes that the claim is asserted against all of the Defendants, and there are no allegations sufficient to show that Officer Baisden has any responsibility for the promulgation of the Ordinance or the power to modify it if the Ordinance is determined to be unconstitutional. Therefore, the claim is DISMISSED as to this Defendant.

**IT IS THEREFORE ORDERED** that Defendants' Motion to Dismiss Plaintiffs' First Amended Complaint and Jury Demand (#**25**) is **GRANTED IN PART AND DENIED IN PART**, as follows:

---

analogous statute that gives airlines exclusive authority to determine who could transport passengers to and from an airport. In addition, the Complaint contains no allegations of facts that are analogous to those in the *Railroad Transfer Service* case.

(1) All claims remain pending against Defendant John Doe. The Plaintiffs shall have 45 days to identify and serve such Defendant and amend the caption of the action, failing which all claims against Defendant John Doe shall be DISMISSED.

(2) Claim One by Mr. Harris is DISMISSED against Denver but, remains pending against Officer Baisden to the extent that it alleges a violation of Mr. Harris' Fourth Amendment rights. To the extent it is alleges violation of Fourteenth Amendment rights it is DISMISSED.

(3) Claims Two and Three are DISMISSED as to Officer Baisden and Denver.

(4) Claim Four is DISMISSED against Officer Baisden, but remains pending as to Denver.

(5) Because dismissal is based on insufficient factual allegations in the First Amended Complaint, the claims are dismissed without prejudice to the filing of a motion to amend as permitted by Fed. R. Civ. P. 15 should the Plaintiffs discover additional facts sufficient to support the claims.

Dated this 30th day of January, 2012

BY THE COURT:

*Marcia S. Krieger*
_____

Marcia S. Krieger
United States District Judge